Filed 6/4/25  Crysel v. Am. Equity Investment Life Holding Co. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT L. CRYSEL et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>AMERICAN EQUITY INVESTMENT LIFE HOLDING COMPANY et al.,<br><br>    Defendants and Respondents. | G062808<br><br>(Super. Ct. No. 30-2018-01016568)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge. Affirmed in part, reversed in part, and remanded with directions.

        Daily Law Group, James D. Daily and Michael R. Jones; Law Offices of Mary A. Lehman and Mary A. Lehman, for Plaintiffs and Appellants.

Alston & Bird, Robert D. Phillips, Jr., Kathy J. Huang, Gillian H. Clow and Brooke Bolender for Defendants and Respondents American Equity Investment Life Holding Company and American Equity Investment Life Insurance Company.

O'Hagan Meyer, Theodore C. Peters and Bessie A. Mafud for Defendants and Respondents Thomas W. Savino and Savino Advisory Group, Inc.

\* \* \*

In 2016, Robert L. Crysel and Suzanne H. Crysel (collectively, the Crysels) bought two fixed index annuities, totaling a little over $1 million, offered by American Equity Investment Life Insurance Company (American Equity). They were advised to do so by Thomas W. Savino, who held himself out as their fiduciary and advisor. To pay for the annuities, the Crysels followed Thomas's[1] advice to sell Robert's shares of Tesla, Inc. (Tesla) and Suzanne's real property. The next year, the Crysels received a large, unexpected tax bill for the stock sale.

The Crysels sued Thomas, Savino Advisory Group, Inc., American Equity, American Equity Investment Life Holding Company (the Holding Company), and others. In a nutshell, the Crysels claimed that Thomas gave them bad financial advice and failed to disclose his conflicts of interest with American Equity, and that all other defendants were liable for Thomas's conduct.

The six-week trial was bifurcated, with 10 causes of action submitted to a jury, followed by a bench trial on three equitable claims. In

---

[1] Because some parties and witnesses share the same last name (i.e., Crysel and Savino), we refer to them by first name to avoid confusion. We intend no disrespect.

2

the end, it was a complete defense verdict. The trial court granted nonsuit on several of the jury claims, including the civil claim for receipt of stolen property (Pen. Code, § 496, subd. (c); the stolen property claim), and the jury found against the Crysels on the remaining claims: breach of fiduciary duty, intentional misrepresentation, and concealment. In the bench trial, the court ruled against the Crysels on the equitable claims: rescission, violation of the unfair competition law (Bus. & Prof. Code, § 17200 et. seq.; UCL), and violation of the false advertising law (*id.*, § 17500 et. seq.; FAL).

On appeal, the Crysels contend the judgment must be reversed because the trial court erred in four ways: (1) excluding evidence of a 2004 desist-and-refrain order issued against American Equity; (2) granting nonsuit on the stolen property claim; (3) finding against the Crysels on their equitable claims; and (4) granting nonsuit to the Holding Company without considering its liability for Thomas's conduct under a principal–agent theory.

With respect to the third contention, we agree with the Crysels and conclude the trial court abused its discretion in ruling against the Crysels on the UCL and rescission claims. We will therefore remand the matter to allow the court to reconsider or retry those claims. In all other respects, we affirm the judgment.

FACTS

I.

THE PARTIES AND THE UNDERLYING EVENTS[2]

In November 2015, Suzanne attended a free "Social Security Maximization" dinner seminar, which was held at a restaurant and hosted by Thomas. She was invited by a friend, who was a client of Thomas. At the

---

[2] The facts are drawn from the evidence at trial and the record on appeal.

seminar, Thomas held himself out as a fiduciary. Typically, the seminars included discussion of investment products, like annuities, life insurance, and managed money, but none are sold there. The attendees were not allowed to ask questions at the seminar. If they wanted more information, they were directed to fill out a form for an in-office appointment.

Suzanne submitted a form for an appointment. At the time, she was in her early 60's and had been a "homemaker" for 20 years. Her husband, Robert, was in his early 50's and was working for the auto manufacturer Tesla building show cars. They had been married for over 20 years. Robert owned roughly $1 million in Tesla stock options, and Suzanne was due to receive an inheritance valued at about $1.2 million (half the value of her late mother's house). They wanted to meet with Thomas to start planning their retirement.

Thomas owned his own business, Savino Advisory Group, Inc., doing business as "Thomas W. Savino, MBA, Savino Tax and Investment Advisory Group." He had an office in Newport Beach, where he provided insurance, investment, and tax services. His wife, Joan, worked as the director of marketing for the business.

Thomas was licensed to sell insurance, which was 80 percent of his business. He sold annuities offered by American Equity and other companies. He also owned stock in the Holding Company. To sell the American Equity annuities, Thomas used marketing materials from its national marketing organization Tucker Advisory Group. The marketing materials included the social security maximization seminar.

Thomas was also a licensed investment advisor representative (IA representative); he held a series 65 securities license, which allowed him to buy, sell, and give advice on buying and selling stocks, bonds, and mutual

4

funds. To do business as an IA representative, an individual must be sponsored by a registered investment advisor (RI advisor). Thomas was sponsored by RI advisor Fusion Investment Advisors, LLC (Fusion).

Although Thomas was not licensed to give tax advice, his business provided tax advice and preparation services through tax preparers.

From December 2015 to July 2016, the Crysels met with Thomas several times at his office. Thomas represented he was an IA representative and a fiduciary, but he never told them he was an insurance agent. At Thomas's request, the Crysels brought financial documents so he could prepare a free "Social Security Maximization and Retirement Income plan." They told him they wanted to retire ten years down the road, when Robert turned 62, because his family had a history of early death. According to Thomas, the Crysels said "they wanted to have enough to retire on . . . and replace Robert's income. They wanted basically zero risk." Suzanne filled out a questionnaire stating she wanted to find the highest social security income possible, lower the fees for investment advice, and have income to replace Robert's income when he retired. The questionnaire included the question, "[H]ow much are you willing to lose?" Suzanne wrote in, "nothing."

At a March 2016 meeting, Thomas gave the Crysels a binder with recommendations for the Crysels (the Binder). The Binder included a title page, which stated: "The custom proposals are prepared for Robert and Susan [*sic*] Crysel in keeping with my fiduciary responsibilities." The Binder was broken into six main sections: (1) Fiduciary Responsibility; (2) Bill of Rights; (3) Problems and Solutions; (4) Social Security Timing Report; (5) Fixed Index Annuity (FIA) – Guaranteed, Safe, Growth, Longevity, Market Participation, Liquidity; and (6) Market Reports.

The "Fiduciary Responsibility" section generally described the "fiduciary standard" for investment advisors, including the duty of loyalty and care, the duty to act in the best interest of the client, and the duty to avoid conflicts of interest.

The "Client Bill of Rights" section, signed by Thomas, stated that clients have rights to "[h]onest, factual answers to their questions," "complete and thorough explanations of the risk and rewards of all products," and "explanation of all transaction costs . . . to purchase, maintain[,] and liquidate [assets]," among other things.

The "Problems and Solutions" section contained Thomas's recommendation for the Crysels: Buy two $500,000 fixed index annuities from American Equity, one each for Robert and Suzanne. The section identified two main problems with the Crysels' current investments. First, the Crysels were "[s]everely overweighted in Tesla" stock. The stock had dropped 20 percent since 2015 and could go up or down. As a solution, he recommended they "[r]educe holdings to 21 [percent]" and "[s]till maintain almost 2,100 shares for potential growth & capital gains." Second, they were "[s]everely overweighted in real estate." His solution was to convert another $500,000 from the sale of real property Suzanne was going to inherit to buy a second annuity. He explained: "$2.5MM asset generates 2.4 [percent return on investment]. Whereas $500,000 in FIA [fixed index annuity] guarantees [a]lmost 10 [percent] return. When there is a sale of the home, another $500,000 needs to be invested in FIA which could generate another $44,000/year and help meet your retirement goal [at] 62 on $1.0MM that's $88,000/yr guaranteed vs. $21,000/yr."

The section provided the following information for fixed index annuities:

6

"FIA's are guaranteed [at]:
- 5.5 [percent] per year
- 0 downside
- Only upside potential
- Participate in the market
- 10 [percent] bonus. The bonus would cover 33 [percent] of capital gains. At end of year one, $80,000 of capital gains covered, or 50 [percent]."

That day, Robert signed the application for the first $500,000 "Bonus Gold" American Equity annuity. The term "Bonus Gold" referred to $50,000 that American Equity gave as a "credit" to the annuity account when an annuity was purchased. Robert paid for the annuity by check, from the money he received from exercising his Tesla stock options and selling the shares. He had personally executed the sales on his ETrade account, which he had with Tesla and which was in the name of the family trust. For the annuity purchase, Robert signed a "suitability acknowledgement" form stating the "financial objectives in purchasing this annuity" were to "[n]umber one, provide lifetime income; number two, preservation of principal."

Four months later, Suzanne bought a second "Bonus Gold" annuity with some of the proceeds from the sale of her mother's home.[3]

The Crysels also used Thomas to prepare their 2016 taxes. Thomas in turn used a tax preparer to calculate their taxes. On their tax return for 2016, the profit from the Tesla stock sale was characterized as "capital gains" rather than "ordinary income," and the tax owed on the stock sale was calculated to be $180,000.

---

[3] The Crysels bought a third annuity for $10,000. The third annuity is not part of this lawsuit.

The next year, in June 2017, the Crysels received a letter from the IRS stating they still owed about $341,000 in taxes. Ultimately, the Crysels had to pay about $100,000 more in taxes, penalties, and tax service fees than the original $180,000 figure. To pay for the unexpected tax, they had to sell more Tesla stock. In total, Robert sold 4,150 Tesla shares to buy his annuity and pay the taxes on the stock sale.

## II.

### THE COMPLAINT

In September 2018, the Crysels filed the underlying lawsuit against Thomas, Savino Advisory Group dba Savino Tax and Investment Advisory Group, American Equity, the Holding Company, Fusion, Tucker Asset Management LLC, Tucker Advisory Group, and its owner Karlan K. Tucker.[4]

The operative complaint alleged 14 causes of action: (1) breach of fiduciary duty; (2) aiding and abetting breach of fiduciary duty; (3) conspiracy to breach fiduciary duty; (4) fraud and deceit; (5) aiding and abetting fraud and deceit; (6) conspiracy to commit fraud and deceit; (7) fraudulent concealment; (8) aiding and abetting fraudulent concealment; (9) conspiracy to commit fraudulent concealment; (10) the stolen property claim; (11) negligent infliction of emotional distress; (12) rescission; (13) violation of the UCL; and (14) violation of the FAL. The claims were asserted against all defendants, except for rescission, which was asserted against American

---

[4] While the appeal was pending, this court granted the parties' stipulation for dismissal of respondents Fusion, Karlan K. Tucker, Tucker Advisory Group, Inc., Tucker Asset Management LLC. We thus limit our discussion of these parties to that which is necessary to provide context and address the relevant issues on appeal.

Equity only. The Crysels further alleged all defendants acted in concert as co-conspirators and were the employer, principal, or agent of one another.

The Crysels alleged three main categories of complaints against Thomas. First, Thomas gave false or incomplete information on the annuities. He didn't disclose they would incur an early withdrawal penalty, a surrender charge of about 11 or 12 percent of the annuity for withdrawing from it in the first 16 years, or that the annuities were set to mature when they would be 114 years old. He misrepresented the annuity would provide a 10 percent return, when the actual return was only 5.5 percent. And he falsely stated the annuities were investments that "participate in the market."

Second, Thomas gave bad tax advice on selling the Tesla stock to buy the annuities, causing the Crysels to incur a large and unexpected tax bill. He also incorrectly advised that they could use the $50,000 "gold bonus" from the annuities to pay the tax on the stock sale.

Third, Thomas didn't disclose his conflicts of interest with American Equity. He owned stock in the Holding Company and would earn more stock by selling American Equity annuities. He received commissions from selling the annuities to the Crysels, and he received vacations, travel, and other rewards for selling the annuities.

III.

THE JURY TRIAL

*A. Trial Testimony*

At trial, over a dozen witnesses testified, including the Crysels, Thomas, Joan, representatives of the various entity defendants, and several expert witnesses.

In typical fashion, the experts testified generally in favor of and consistent with their own side's positions. The Crysels' experts testified

9

Thomas breached his fiduciary duties, concealed material information, and made material misrepresentations. The defense's experts testified Thomas did not act inappropriately.

Thomas admitted the free seminars were a "marketing tool" to sell American Equity annuities. He didn't disclose to seminar attendees that the purpose of the seminar was to make appointments to sell annuities and that it was 80 percent of his business. He thought he didn't need to because the information was "not material." He didn't tell the Crysels about his stock in the Holding Company. Thomas believed he was acting within his authority as an IA representative to recommend the sale of Tesla stock to buy an annuity. Thomas didn't disclose he received $80,000 in commissions for the sale of the two annuities since the Crysels were not paying the commissions.

Thomas explained he used American Equity because "the bonus [gold] was the number one rated product in the industry" based on a study by Barron's Review of the top "15 insurance carriers." Between the two annuities, they were guaranteed a joint payout of about $86,000 starting at their retirement 10 years later. Thomas described it as "Social Security on steroids" because the payment remains the same even when one spouse dies. He testified, "I sold it on a guaranteed 5.5 percent return, 10 percent bonus over 10 years because that's when he was going to retire."

According to Thomas, he told the Crysels the annuity was "a 17-year product. And the surrender fees go from 20 percent down to zero in the 17th year. . . . This is not a product that you treat as a checkbook, and it's not a product that you say, 'Give me my cash.' [¶] And the reason I say that is because if you look at the surrender fees, all right, my comment was precisely, 'They will kill you,' meaning the surrender fees will take a lot of

10

your money, and you do not want that. If this—if you do that, this is not your product."

The Crysels testified they didn't really read the annuity documents. Robert suffered from Alzheimer's, dyslexia, and other ailments affecting his hearing, reading, comprehension, and retention. They relied on Thomas to give them advice. They knew they had to pay taxes on the stock sale, but Thomas didn't accurately explain how much those taxes would be.

The Crysels maintained that they wouldn't have followed Thomas's advice had they known he owned stock in the Holding Company. Instead, they would have kept the Tesla stock. Suzanne testified, "Tesla was kind of a roller coaster ride, but we were belted in. We were ready to ride. Robert was basically planning—we were both planning to keep the stock until we retired."

As damages for the purchase of Robert's annuity, the Crysels wanted to get back the Tesla stock they sold to pay for the annuity (or the cash equivalent of the stock's present day value). Their expert testified that, had they kept that stock until trial, the shares would have undergone two stock splits, increasing from 4,150 to 62,250 shares, and would be worth about $12 million. Adjusted for taxes, the net total would be roughly $11.5 million. As damages for purchase of Suzanne's annuity, the Crysels wanted their money back.

In defense, the defendants argued the annuities had a free 30-day look period during which the Crysels could have canceled them if "dissatisfied for any reason." But the Crysels never asked for their money back or sought to cancel the annuities.

Thomas testified Tesla "was the highest risk stock in the market at that point in time. Downside was horrific." He recommended selling

11

60 percent of the Tesla stock "more so on diversification." Thomas testified, "If you look at their December 2015 statement, they have 1.068 million at E[]Trade. The next month it went down $243,000. That's a risky stock. And they were overweighted in it." He testified he would have recommended the sale even if the Crysels had not wanted an annuity.

A defense expert gave a similar opinion. Tesla stock during that period was "about four times as volatile" as the S&P 500. If the "investment objective is safety of principal, Tesla as a stock is the polar opposite of that. It's extraordinarily risky. It's completely at the other end of the spectrum." Tesla stock also would not be good to own for an investor looking for income because it doesn't pay dividends. He opined the annuities were suitable because they "matched the investment objective, which was to produce deferred income upon retirement," and "matched the risk tolerance."

The expert testified that Thomas's advice to sell Tesla stock and buy annuities were two different recommendations. The expert opined that, because the Tesla stock was so risky and the Crysels' investment objectives were safety of principal and income, "just about any competent investment person in that situation would say no, they should not hold it."

Concerning the claim of Thomas giving bad tax advice, the Crysels argued the profit from the 2016 Tesla stock sale should have been treated as ordinary income for purposes of calculating tax, but that Thomas mischaracterized it as capital gains. This mischaracterization allowed Thomas to misrepresent the tax consequences on the sale as lower than they were. The Crysels presented evidence that, had they known the true facts, they could have acted to lower their tax burden. To qualify the stock sale as capital gains, the Crysels could have waited over a year after exercising the stock options to sell the shares. Had they done this, they would have saved

12

about $92,000 in taxes. Thus, the Crysels claimed that over the three year period of 2016–2018 they had to pay $231,000 to $240,000 more in taxes.

The defense offered evidence to support the argument that the Crysels were at fault for the tax mischaracterization. Thomas testified that the Crysels were on notice the 2016 stock sale would be treated as ordinary income but never advised him of this fact. Specifically, Robert had sold Tesla stock in 2013 and paid taxes on the sale. According to the defense, the 2013 stock sale would have been treated as ordinary income, so the Crysels "actually knew that they were going to be taxed as ordinary income on [the 2016] sales."

B. Motions for Nonsuit

After the Crysels' case in chief, all defendants moved for nonsuit. For the Holding Company, Tucker Advisory Group, Karlan Tucker, and Fusion, the court granted nonsuit and dismissed all claims against them. For Thomas, the court granted partial nonsuit and permitted the claims of breach of fiduciary duty, fraud and deceit, fraudulent concealment, UCL violations, and FAL violations to go to the jury. For American Equity, the court granted partial nonsuit and allowed the same claims proceeding against Thomas to proceed against American Equity, but only under a vicarious liability/agency theory.[5]

C. More Trial Testimony

After the nonsuit rulings, the defendants presented the remainder of their case.

_____

[5] American Equity did not move for nonsuit on the rescission claim.

13

An American Equity employee testified that after the lawsuit was filed, she wrote three letters to counsel for the Crysels offering to rescind the annuities and give them their money back plus 1.5 percent interest. The letters were not settlement offers and did not require the Crysels to abandon their lawsuit. The employee never received a response to the letters.

An economist retained by the defense evaluated the Crysels' damage claims associated with the annuities and Tesla stock sale. The economist criticized the opinion of the Crysels' expert that they were damaged in the amount of $11.5 million because that opinion was based on the assumption they would hold the 4,150 shares until trial, and not based on a "projection of what would have occurred in the but-for world." The economist posed the question of damages differently: "So in the but-for world, if the Crysels were represented with a better annuity, how was it supposed to have been [*sic*] performed?"

The economist looked at the Crysels' stock options activity up through the ETrade April 2014 statement. He saw that Robert had a history of exercising and selling some of his stock options: "[T]he typical pattern is [Robert] would receive restricted stock units, they would vest and be sold, vest and be sold, not necessarily entirely in one month, but it would drop down to zero, meaning all available restricted stock units were sold. I counted five times that that happened"—December 2015, August 2016, December 2016, March 2017, and April 2019, when all remaining restricted stock units were sold. These dates preceded when "Tesla started experiencing incredible growth" in April 2020.

Because Robert was let go from Tesla in January 2019, he had to exercise all available stock options by April 2019. This is why in April 2019 Robert sold all remaining options and restricted stock units. According to the

14

economist, had Robert sold the 4,150 shares in April 2019, "they would have received $1,097,338 versus [$]983,443. So there's a $113,895 in extra proceeds that they would have received if they waited till April 2019."

## IV.

### THE VERDICT, RULING ON EQUITABLE CLAIMS, AND APPEAL

The jury found the Crysels had not established all the elements of their claims of breach of fiduciary duty, intentional misrepresentation, or intentional concealment against Thomas. It also found they had not proven by clear and convincing evidence that [Thomas] acted with malice, oppression, or fraud against them. In light of these findings, the jury never answered the questions concerning whether American Equity was liable under an agency theory for Thomas's conduct.

The trial court found in favor of American Equity on the rescission claim, and in favor of Thomas and American Equity on the UCL and FAL claims.

The Crysels timely appealed the judgment.

## DISCUSSION

## I.

### THE 2004 DESIST-AND-REFRAIN ORDER

The Crysels contend the trial court wrongly excluded evidence of a 2004 order issued by the California Corporations Commissioner against American Equity, an insurance agent, and a marketing firm—none of whom were licensed in California to sell securities—"to desist and refrain from advising people to sell securities in order to buy annuities unless and until" they secure the proper certificate to do business as investment advisers in the state (the Order). We disagree.

15

The ruling on the Order covered three evidentiary matters: (1) American Equity and the Holding Company's motion in limine to exclude the Order; (2) the Crysels' motion in limine to admit the Order; and (3) the trial court's refusal to allow the Crysels to offer the Order as impeachment evidence. The court excluded the evidence on relevance and Evidence Code section 352 grounds.

"Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute." (*People v. Heard* (2003) 31 Cal.4th 946, 972–973; Evid. Code, §§ 350–351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"" (*Heard*, at p. 973.) "The trial court has broad discretion in determining the relevance of evidence." (*Ibid.*) It also "has the discretion to exclude otherwise relevant evidence when its probative value is substantially outweighed by 'the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 223 (*D.Z.*).)

We review the trial court's evidentiary ruling for abuse of discretion. (*D.Z.*, *supra*, 35 Cal.App.5th at p. 223.) ""Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered."'" (*Ibid.*) An evidentiary ruling, even if made in error, "is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou v.*

16

*Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; Evid. Code, § 354; Code Civ. Proc., § 475.) "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*).)

In excluding the Order, the trial court correctly noted the Order "is about other people, not [Thomas]." The Order stated that the marketing firm was a "living trust mill" that purported to offer senior citizens free advice on living trusts with the ulterior motive of selling them annuities. The Order described a scenario in which a woman, believing the insurance agent would be providing free estate planning review, showed the agent her financial records and personal information. Without the woman's knowledge, the agent induced her to sign documents authorizing the sale of securities and use of the proceeds to buy American Equity annuities. The court reasoned the Crysels' claims were based not on Thomas being an unlicensed investment advisor, but on him giving bad advice and concealing facts, regardless of his license status.

The Crysels contend the Order is probative of their claim that Thomas's free seminars were hosted under the false pretense of providing education on Social Security, with the true aim being to sell seminar annuities to attendees, that Thomas was required to be a certified investment advisor to advise the Crysels, and that he "was indeed a fiduciary to the Crysels." But the Order was issued nearly 20 years prior, concerned different agents of American Equity, and was directed at parties who were not licensed for the activities they were pursuing. As such, the Order has little to no relevance regarding Thomas's conduct. There was, however, a substantial danger of undue prejudice, confusing the issues, and misleading the jury.

17

Simply put, the Order would have posed the risk of the jury punishing Thomas for the conduct of another nearly two decades ago.

The Crysels also argue the Order is probative of their claims against American Equity, specifically to show that Thomas was an American Equity agent or employee, and that American Equity is liable for aiding and abetting and conspiracy. The Crysels also argue it was relevant to "impeach an American Equity witness who denied [the company's] obligation imposed in that Order."

We need not consider the probative value of the Order as it relates to American Equity. Even assuming there was probative value, the Crysels cannot show resulting prejudice. The trial court allowed claims against American Equity to go to the jury based only on the theory of vicarious liability/agency. The Crysels do not challenge this ruling. On all claims submitted to the jury, the jury returned a defense verdict for Thomas, which foreclosed any vicarious liability finding on the part of American Equity. The Order, if admitted, would not change this result.

For these reasons, we conclude the trial court did not err in excluding the Order from evidence.

## II.

### THE STOLEN PROPERTY CLAIM

The Crysels contend the trial court erred in granting nonsuit on their stolen property claim. We disagree.

"'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to

18

plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor.'" [Citation.] A mere "scintilla of evidence" does not create a conflict for the jury's resolution; "there must be *substantial evidence* to create the necessary conflict.'"" (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495 (*Piedra*).)

"In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff." [Citation.] We will not sustain the judgment "'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.'"" (*Piedra*, *supra*, 123 Cal.App.4th at p. 1495.) "We may not, however, consider the supporting evidence in isolation, and disregard any contradictory evidence; rather, we must review the entire record." (*Ibid.*) Even if a grant of nonsuit was error, the error must be prejudicial to warrant reversal on appeal. (*Id.*, at p. 1499.)

Penal Code section 496, subdivision (a), "defines the criminal offense of what is commonly referred to as receiving stolen property." (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal.5th 333, 346 (*Siry*).) To sustain a criminal conviction for this offense, "the prosecution must prove (1) the property was stolen; (2) the defendant knew the property was stolen;

19

and, (3) the defendant had possession of the stolen property."[6] (*People v. Land* (1994) 30 Cal.App.4th 220, 223.) A person who obtains property "in any manner constituting theft" may also be sued civilly for "treble damages and attorney's fees." (*Siry*, at p. 361; Pen. Code, § 496, subd. (c); see also Pen. Code, § 484, subd. (a) [defining theft].)

Most significant here is our Supreme Court's discussion on intent: "We pause to elaborate on these points, and, specifically, criminal intent under the statute. . . . Although we are not asked here to determine whether plaintiff would have been able to prove theft, we observe that not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft. To prove theft, a plaintiff must establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity.' [Citation.] This requirement prevents "'[o]rdinary commercial defaults"' from being transformed into a theft. [Citation.] If misrepresentations or unfulfilled promises 'are made innocently or inadvertently, they can no more form the basis for a prosecution for obtaining property by false pretenses than can an innocent breach of contract.'" (*Siry*, *supra*, 13 Cal.5th at pp. 361-362.)

---

[6] As relevant here, the statute provides: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail . . . . [¶] A principal in the actual theft of the property may be convicted pursuant to this section. However, no person may be convicted both pursuant to this section and of the theft of the same property." (Pen. Code, § 496, subd. (a).)

Here, the trial court found that the Crysels failed to establish the stolen property claim. Specifically, the court found the Tesla stock was not stolen because no defendant ever had possession of it, "[a]nd to the extent that [the Crysels] paid money for these annuities, they got the annuities. So an equal exchange of value. Nothing was stolen." The court also found no defendant knew the property was stolen or had possession of it.

We agree with the trial court's reasoning. Nothing was stolen. Defendants never received the Tesla stock, nor did they intend to possess it. Instead, the Crysels' claim is premised on the theory that the annuities were less valuable than the $500,000 from the Tesla stock sale and the $500,000 from the inheritance. They are mistaken. They paid $1 million for two $500,000 annuities—an even exchange.[7] To the extent the Crysels rely on the potential future value of the Tesla stock to show an unequal exchange of value, that claim would fail as well. The value of a stolen item is measured by the fair market value of the item at the time and place of its theft. (*People v. Pena* (1977) 68 Cal.App.3d 100, 102, fn. 1; Pen. Code § 484, subd. (a); CALCRIM No. 1801.) The Crysels sold the Tesla stock at its public stock price and promptly bought Robert's annuity. The fair market value of the stock at the time and place of its alleged theft was the price they paid for the annuity.

None of the cases relied upon by the Crysels compel a different result. They are distinguishable from our case in that the victims were alleged to have received no value in exchange for their property. (See, e.g.,

_____

[7] We also note that the Crysels had 30 days to cancel the annuities and receive a refund, and that American Equity later offered to cancel their annuities with 1.5 percent interest.

21

*Siry, supra,* 13 Cal.5th at p. 361 [defendants allegedly diverted partnership funds not belonging to them]; *Bell v. Feibush* (2013) 212 Cal.App.4th 1041, 1043–1044 [defendant scammed plaintiff to loan him more than $200,000 and "never repaid her"]; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 451, 453 [stolen property claim based on allegation that Merrill Lynch invested and lost billions of dollars of their client money in "highly speculative investment strategy," forcing client into bankruptcy].)

In sum, the Crysels' stolen property claim was just an ordinary commercial dispute, and the trial court correctly ruled that the evidence was insufficient to allow the jury to find in their favor.

III.

THE EQUITABLE CLAIMS

The Crysels argue the trial court erred by concluding the jury's factual findings precluded them from prevailing on their equitable claims. We agree the court erred in so ruling, but we conclude reversal is required on the UCL and rescission claims only.

*A. The Statement of Decision*

The trial court issued a written statement of decision, incorporating by reference its oral statement of reasons set forth in open court after the conclusion of trial, which we summarize as follows.

The trial court noted that all equitable claims submitted to it were based on the same facts and theories presented to—and rejected by—the jury. From this, the court concluded "the jury found there was no fraud" and "adopt[ed] those factual findings." In addition, the court independently concluded the Crysels failed to establish that any of the defendants had an intent to defraud or deceive either of them, or that they committed negligent

22

misrepresentation. The court further concluded "that because [the Crysels] argued to the jury that [they] should have their purchase price for the annuities returned to them, [the Crysels] already had this issue decided and/or waived that issue being decided by the court. Finally, by proceeding with their claims for money damages to the jury, [the Crysels] elected those remedies rather than their cause of action for [r]escission."

B. *The Doctrine of Implied Findings*

Before ruling on the merits, we must determine whether the doctrine of implied findings applies here, as urged by respondents. We conclude it does not apply to the issues properly raised by the Crysels in their objections to the trial court's proposed statement of decision.

On appeal from a judgment based upon a statement of decision, we review questions of law de novo and findings of fact for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) "'Substantial evidence means evidence which is of ponderable legal significance—evidence which is reasonable in nature, credible and of solid value'" (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.) "'"[A]ny conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision."'"(*Ibid.*) "'We may not reweigh the evidence and are bound by the trial court's credibility determinations. . . . The testimony of a single witness may be sufficient to constitute substantial evidence.'" (*Ibid.*)

"The doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to support the judgment. [Citation.] The doctrine is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of

23

correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).)

To avoid application of the doctrine, a party must follow a two-step process. "First, a party must request a statement of decision pursuant to Code of Civil Procedure section 632. [Citation.] Second, if the trial court issues a statement of decision, a party claiming omissions or ambiguities in the factual findings must bring the omissions or ambiguities to the trial court's attention." (*Fladeboe, supra*, 150 Cal.App.4th. at p. 59.) If the party fails to do so, "then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues." (*Id.* at pp. 59–60.)

Here, the Crysels followed the two-step process. They timely filed a request for a statement of decision setting forth 54 controverted issues and objections to the trial court's proposed statement of decision. Accordingly, we will consider issues raised by the Crysels in their objections without regard to the implied findings doctrine.

## C. The UCL Claim

The Crysels present two challenges to the trial court's ruling on the UCL claim. We agree with both.

First, the Crysels argued below, and on appeal, that the trial court erred by relying on the jury's factual findings and applying them to the UCL claim. According to the Crysels, the jury was presented with a general verdict form and thus made no factual findings. In their appellate briefs, respondents do not dispute the jury rendered a general verdict; they instead argue the court was entitled to adopt factual findings notwithstanding the

24

absence of a special verdict. The Crysels are partially correct: The jury was presented with a general verdict form—but one which included special interrogatories.

A general verdict is one where the "jury is asked to pronounce generally in favor of the plaintiff or defendant on all or any of the issues"; whereas, a special verdict asks the jury to find facts and leaves the judgment to the court. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347, fn. 7; Code Civ. Proc., § 624.) In all cases, including a general verdict, the jury may be asked to answer special interrogatories "to find upon particular questions of fact." (Code Civ. Proc., § 625; *Hurlbut v. Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 403.)

Here, the jury was asked four main questions. The first three asked if the Crysels "established all of the elements" for each of the three legal claims presented to the jury (breach of fiduciary duty, intentional misrepresentation, and concealment), and the fourth asked if the Crysels had "proven by clear and convincing evidence that Thomas [ ] acted with malice, oppression, or fraud towards them[.]" If the jury answered "yes" to any of these questions, the verdict form directed the jury to answer follow-up questions about American Equity's liability on that claim. If the answer was "no," the jury was directed to skip the follow-up questions. The verdict form presented to the jury thus was a general verdict form with special interrogatories. (Code Civ. Proc., §§ 624–625.)

The jury answered "no" to the four main questions, skipping the questions concerning American Equity. Because the jury rendered a general verdict on the legal claims, it was impossible for the trial court to identify any factual findings made by the jury. For example, the elements for a claim of fraud are ""(a) misrepresentation (false representation, concealment, or

25

nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"'" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.) A jury determination that the Crysels had not "established all of the elements" of fraud does not shed any light on whether the jury found against them on all elements or just one. It was possible for the jury to have found that the Crysels proved all but resulting damage. Given this uncertainty, the court erred in relying on any jury findings.

The trial court also independently determined the Crysels failed to show any defendant intentionally defrauded them or made a negligent misrepresentation. The court specifically found the Crysels "did not establish that Thomas . . . made a representation to either of [them] that a fact was true, for which that representation was not true, and for which although [Thomas] may have honestly believed that the representation was true, he had no reasonable grounds for believing the representation was true when he made it." Those findings, however, do not completely resolve the UCL claim.

As the Crysels argued below and on appeal, a true statement is actionable under the UCL so long as it is likely to mislead or deceive the consumer. "The UCL and the FAL were enacted for the specific purpose of creating new rights and remedies that were not available at common law. [Citation.] The statutes deliberately broaden the types of business practices that can properly be found to constitute unfair competition [citation], and eliminate a number of elements that were required in common law actions for fraud [citations]." (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 322–323.) Under the UCL, "unfair competition" is any "unlawful, unfair or fraudulent business practice" or any "unfair, deceptive, untrue or misleading advertising." (Bus. & Prof. Code, § 17200.)

26

"[T]o state a claim under the [UCL] one need not plead and prove the elements of a tort." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 (*Bank of the West*).)

A UCL claim based on fraudulent business practices "'is 'distinct from common law fraud. 'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for . . . relief' under the UCL.'" (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 252.) Under the UCL, "one need only show that 'members of the public are likely to be deceived.'" (*Bank of the West, supra*, 2 Cal.4th at p. 1267.) "'A fraudulent business practice ""may be accurate on some level, but will nonetheless tend to mislead or deceive . . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under"' the UCL.'" (*Boschma, supra*, at p. 253.)

In their objections to the proposed statement of decision, the Crysels argued the test for a UCL violation was "'whether the public is likely to be deceived,'" not whether the defendant had intent to defraud or deceive. The court nevertheless chose not to address this objection in an amended statement of decision. Because the court failed to make findings that completely dispose of the UCL claim, remand is appropriate for the court to reconsider this claim.

*D. The FAL Claim*

Unlike a UCL claim, an FAL claim contains a scienter requirement: "Pursuant to [Business & Professions Code,] section 17500, it is unlawful to make or cause to be made with the intent to perform services a public *statement* concerning any circumstance or matter of fact *'which is*

27

*known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .'"* (*Khan v. Medical Board* (1993) 12 Cal.App.4th 1834, 1846, italics added.) In other words, a plaintiff suing for false advertising must show the defendant was at least negligent when the statement was made. (See *ibid.* [FAL "can be violated through negligence"].)

Here, the trial court found the Crysels failed to show any defendant made an intentional or negligent misrepresentation. Because the court independently found against the Crysels on a key element of the FAL claim and because the Crysels do not challenge this finding on appeal, we need not consider the Crysels' other attacks on this claim. The Crysels cannot show prejudicial error as to this claim. (*Cassim*, *supra*, 33 Cal.4th at pp. 801–802 [reversal requires showing of prejudice, or "miscarriage of justice"].) The judgment on the FAL claim is therefore affirmed.

*E. The Rescission Claim Against American Equity*

In addition to relying on the jury's purported factual findings, the trial court made two other determinations on the rescission claim: (1) the Crysels waived their right to have that issue decided by the court because it was argued to the jury; and (2) they elected the remedy of money damages by proceeding with their legal claims. We agree with the Crysels that these rulings were erroneous.

First, the trial court erred in concluding "that because [the Crysels] argued to the jury that [they] should have their purchase price for the annuities returned to them, [the Crysels] already had this issue decided and/or waived that issue being decided by the court."

"'Generally, in mixed actions, the equitable issues should be tried first by the court, either with or without an advisory jury.'" (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 355.)

28

"If the trial court holds a jury trial first on any legal issues, the court is bound by the jury's factual findings when it considers any equitable issues." (*Id.* at p. 355, fn. 52; see also *Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 158 (*Hoopes*) ["Where legal claims are first tried by a jury and equitable claims later tried by a judge, the trial court must follow the jury's factual determinations on common issues of fact].)

While it is true the jury's determination that the Crysels had failed to establish their claims for breach of fiduciary duty, intentional misrepresentation, and intentional concealment meant that the trial court could not grant inconsistent equitable relief (*Hoopes*, *supra*, 168 Cal.App.4th at p. 156), a finding by the court that Thomas had made misrepresentations or concealed material facts would not necessarily be inconsistent with the jury verdict. As we have discussed, the court could not rely on the jury's factual findings to reject the Crysels' equitable claims. This is because the jury rendered a general verdict and made no special findings that necessarily foreclosed a grant of rescission.

Even if the trial court could infer from the verdict that the jury found no fraud on Thomas's part, the court could not rely on those findings to disregard a rescission claim based on mistake. "A party may rescind a contract if his or her consent was given by mistake." (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 282; Civ. Code, § 1689, subd. (b)(1).) "A factual mistake by one party to a contract, or unilateral mistake," is sometimes enough to rescind a contract. (*Donovan*, at p. 282.) To obtain rescission of one or both of the annuities on the grounds of mistake, the Crysels had to establish the following facts: "'(1) [they] made a mistake regarding a basic assumption upon which [they] made the contract; (2) the mistake has a material effect upon the agreed exchange of performances that is adverse to [them]; (3) [they

29

do] not bear the risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract would be unconscionable.'" (*Ibid.*) Thus, the rescission claim "was a distinct matter . . . that raised legal and factual issues undecided by the jury." (*Hoopes, supra,* 168 Cal.App.4th at p. 155 [discussing issue of equitable estoppel].)

Second, the trial court erred in concluding that, "by proceeding with their claims for money damages to the jury, [the Crysels] elected those remedies rather than their cause of action for [r]escission." The Crysels did not lose their right to obtain rescission simply by trying their money damage claims to the jury first. "Rescission is intended to restore the parties as nearly as possible to their former positions and '"to bring about substantial justice by adjusting the equities between the parties' despite the fact that 'the status quo cannot be exactly reproduced.'"'" (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1386.) "To achieve this objective, Civil Code section 1692 provides that '[a] claim for damages is not inconsistent with a claim for relief based upon rescission.' It further provides that the aggrieved party shall be awarded 'complete relief,' including restitution and 'consequential damages.'" (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1144 (*Sharabianlou*).)

Nor did the Crysels "elect" any remedy by *unsuccessfully* trying the legal claims to the jury first. To be sure, relief for rescission "shall not include duplicate or inconsistent items of recovery." (Civ. Code, § 1692.) But where a plaintiff *loses* on his legal claim for money damages, there is no danger of double or inconsistent recovery if the plaintiff were to proceed with his equitable claims.

Finally, to the extent the trial court believed the Crysels were barred from pursuing their rescission claim because they had prosecuted their legal claims, the trial court is mistaken. While it is true that electing a

judgment based on one remedy precludes an inconsistent one (*Vlahovich v. Cruz* (1989) 213 Cal.App.3d 317, 322–323), that is not what happened here. "[R]escission is a remedy that *disaffirms* the contract." (*Sharabianlou, supra,* 181 Cal.App.4th at p. 1145.) "Rescission extinguishes the contract (Civ. Code, § 1688), terminates further liability, and restores the parties to their former positions by requiring them to return whatever consideration they have received. [Citation.] Thus, the '[r]elief given in rescission cases—restitution and in some cases consequential damages—puts the rescinding party in the *status quo ante,* returning him to his economic position before he entered the contract.'" (*Id.*, at p. 1145.) None of the Crysels' legal claims were premised on an *affirmance* of the annuities—they did not sue for breach of the annuities.

For these reasons, we conclude the matter must be remanded for the trial court to reconsider the rescission claim.

IV.

THE HOLDING COMPANY

The trial court granted nonsuit for the Holding Company, reasoning that keeping it in the lawsuit as an alter ego of American Equity was unnecessary because American Equity could satisfy any judgment entered against it. The Crysels do not challenge this finding. Instead, they argue the court erred because it ignored their alternative theory of liability, i.e., that Thomas was an agent of the Holding Company, and there was substantial evidence to support this claim. Although the Crysels did allege Thomas was an agent of the Holding Company, we conclude there was no substantial evidence of an agency relationship between Thomas and the Holding Company with respect to the Crysels' annuities.

"An agent is one who represents another, called the principal, *in dealings with third persons.*" (Civ. Code, § 2295, italics added.) An """"essential characteristic[] of an agency relationship"""" is that the agent """"holds a power to *alter the legal relations between the principal and third persons* and between the principal and himself."""" (*Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp.* (2007) 148 Cal.App.4th 937, 964, italics added (*Garlock*).)

Here, the Crysels contend the following evidence supports their agency theory. The Holding Company is the sole shareholder of American Equity. A document was admitted with the Holding Company's logo indicating that American Equity was one of its subsidiaries, and that each subsidiary and their agents were subject to "Principles of Ethical Market Conduct." Thomas's agent contract with American Equity provided the contract was with "all companies affiliated with American Equity," which included the Holding Company. Finally, the Holding Company issued the American Equity stock to Thomas as compensation for his annuity sales. For purposes of this analysis, we accept these facts as true. (*Piedra*, *supra*, 123 Cal.App.4th at p. 1495.)

But there was no evidence at trial showing Thomas acted in any way to alter the legal relations between the Holding Company and the Crysels. (*Garlock, supra,* 148 Cal.App.4th at p. 964; Civ. Code, § 2295.) The Crysels bought annuities sold by American Equity, not the Holding Company. In fact, the Crysels sued American Equity, not the Holding Company, for rescission of those annuities. For this reason, the Crysels' argument fails.

DISPOSITION

We reverse the judgment as it affects Thomas Savino, Savino Advisory Group, Inc., and American Equity Investment Life Insurance Company. The matter is remanded with directions that the trial court reconsider or retry the UCL and rescission causes of action. In all other respects, we affirm the judgment. The parties shall bear their own costs on appeal.

DELANEY, J.

WE CONCUR:

MOORE, ACTING P. J.

SANCHEZ, J.

33